ESTATE OF ETHYL L. GOODRICH, DECEASED, HERBERT VERNON JONES, MILDRED J. GAY and PEOPLES LOAN & TRUST COMPANY, WINCHESTER, INDIANA, CO-EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Goodrich v. Commissioner
Docket No. 7762-76.
United States Tax Court
T.C. Memo 1978-248; 1978 Tax Ct. Memo LEXIS 267; 37 T.C.M. (CCH) 1062; T.C.M. (RIA) 78248; July 5, 1978, Filed Robert N. Davies, *268 Richard E. Aikman, and Charles E. Schalliol, for the petitioner. Richard E. Trogolo, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the Federal estate tax of the Estate of Ethyl L. Goodrich, deceased, Herbert Vernon Jones, Mildred J. Gay and Peoples Loan & Trust Company, Winchester, Indiana, co-executors, in the amount of $ 355,323.04. The only issues for decision are the fair market values, as of the alternate estate tax valuation date, of four issues of stock and certain voting trust certificates owned by decedent at her death. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The decedent, Ethyl L. Goodrich, died testate on November 12, 1973. She was a resident of Winchester, Indiana. Herbert Vernon Jones, Mildred J. Gay and Peoples Loan & Trust Company, Winchester, Indiana, as co-executors of the Estate of Ethyl L. Goodrich, timely filed a Federal estate tax return for the estate with the Internal Revenue Service. At the time they filed the petition in this case, Herbert Vernon Jones resided in Muncie, Indiana, Mildred J. Gay *269 resided in Miami, Florida, and Peoples Loan & Trust Company had its principal place of business in Winchester, Indiana. On the date of her death, decedent owned certain securities, including: Company
Issue
Amount
Central Shares,
5-1/2% Cumulative Preferred
3,975 Shares
Inc.
Class A Common
397.5 Shares
Class B Common
397.5 Shares
Indiana Telephone
Voting Trust
2,907.44 Units
Corporation
Certificates
Public Telephone
Common
937.5 Shares
Corporation
None of these securities were regularly traded on a securities exchange or in any established over-the-counter market. Their value was not otherwise readily ascertainable. Decedent's holdings in Central Shares, Inc. (hereinafter referred to as Central Shares) represented 11.83 percent of each of the three classes of Central Shares securities outstanding. Central Shares was a closely held Indiana corporation that was formed in 1940 to hold for investment securities of Central Newspapers, Inc. (hereinafter referred to as Central Newspapers), another Indiana corporation. On the date in issue, May 12, 1974, and for years prior to that date, Central Shares was a personal holding company, as *270 defined in section 542, I.R.C. 1954, [1] subject to the personal holding company tax of section 541. Central Shares' securities were not registered under the Securities Act of 1933, and the company was not registered under the Investment Company Act of 1940. The preferred stock of Central Shares was entitled to a cumulative dividend of $ 1.10 per share per year. It had a par value of $ 20 per share, was callable at the option of the board of directors for $ 21 per share plus accrued but unpaid dividends, and was entitled to $ 20 per share plus accrued but unpaid dividends on liquidation or dissolution. The Class A common stock of Central Shares was entitled to a cumulative dividend of $ 1.60 per share per year, and no more, in preference to the Class B common stockholders. It had a par value of $ 25 per share, was not callable, and in case of liquidation or dissolution was entitled to $ 25 per share, and no more, in preference to the Class B common stockholders. The Class B common stock of Central Shares was entitled to any residual earnings and any residual proceeds *271 in liquidation or dissolution. It had no par value. Most of Central Shares' earnings were distributed to the Class B common stockholders to avoid personal holding company taxes. The following table shows the dividend history of Central Shares for its six fiscal years 1969 through 1974: FYE
FYE
FYE
FYE
FYE
FYE
July 31,
July 31,
July 31,
July 31,
July 31,
July 31,
1969
1970
1971
1972
1973
1974
Total Dividends Paid
$ 283,248
$ 303,072
$ 279,552
$ 280,056
$ 309,624
$ 364,056
Preferred Dividends
@ $ 1.10/share
33,600 shares
36,960
36,960
36,960
36,960
36,960
36,960
Class A Dividends @
$ 1.60/share 3,360
shares
5,376
5,376
5,376
5,376
5,376
5,376
Amount Available for
Class B Dividends
240,912
260,736
237,216
237,720
267,288
321,720
Dividends Paid/share
of Class B 3,360
shares
71.70
77.60
70.60
70.75
79.55
95.75
Central Shares' preferred and Class B common stock had either no or very limited voting rights. Voting control of Central Shares was vested in its Class A common stock, which carried one vote per share. A majority of the Class A common stock, 2,447.25 of 3,360 shares, was held in *272 a voting trust created on November 17, 1959. This trust therefore held control of Central Shares. Decedent's shares were not a part of this voting trust. Central Shares' principal assets were holdings in the three classes of stock of Central Newspapers. Balance sheets of Central Shares for July 31, 1973, the end of its fiscal year, and for April 30, 1974, the end of the quarter immediately prior to decedent's death, and partial data for July 31, 1974, are reproduced below: CENTRAL SHARES, INC.
BALANCE SHEET ASSETS
JULY 31, 1974
APRIL 30, 1974
JULY 31, 1973
LIQUID ASSETS
Cash in Bank
$ 23,583.89
$ 61,933.98
Petty Cash
50.00
0
U.S. Governments
378,138.40
157,076.80
Account Receivable Expenses
5,613.45
10,489.99
Books and Supplies
1,420.25
1,249.76
Total Liquid Assets
$ 200,258.00
$ 408,805.99
$ 230,750.53
INVESTMENT IN CENTRAL NEWSPAPERS, INC.
Cum. Pref. Stock, $ 25 par,
8,512 shares
$ 212,800.00
$ 212,800.00
$ 212,800.00
Class A Common, no par,
26,624 shares
665,600.00
665,600.00
665,600.00
Class B Common, no par,
3,328 shares
83,200.00
83,200.00
83,200.00
Total Investment
$ 961,600.00
$ 961,600.00
$ 961,600.00
OTHER ASSETS
Furniture and Fixtures, net of
depreciation
$ 7,373.15
$ 3,360.78
Improvements, net of depreciation
10,950.96
10,950.96
Organization Expense
363.59
363.59
Total Other Assets
$ 48,024.00
$ 18,687.70
$ 14,675.33
TOTAL ASSETS
$ 1,209,882.00
$ 1,389,093.69
$ 1,207,025.86
CURRENT LIABILITIES
Payroll Taxes Payable
$ 1,023.34
$ 1,650.12
Federal Income Taxes Payable-
accrual to date
17,397.00
17,182.69
Less - Installments paid on
Estimated Federal Income Taxes
for current Fiscal Year
(9,600.00)
(9,000.00)
Total Current Liabilities
$ 8,820.34
$ 9,832.81
OTHER LIABILITIES
Reserve - Redecorating
$ 2,191.32
$ 2,077.22
TOTAL LIABILITIES
$ 11,914.00
$ 11,011.66
$ 11,910.03
CAPITAL STOCK AND SURPLUS
Preferred Stock, Cum., 33,600
shares at $ 20 par
$ 672,000.00
$ 672,000.00
$ 672,000.00
Class A Common Stock, Cum.,
3,360 shares at $ 25 par
84,000.00
84,000.00
84,000.00
Class B Common Stock, 3,360
shares, no par
84,000.00
84,000.00
84,000.00
Paid in Surplus
345,224.39
345,224.39
Earned Surplus - per accompanying
statement
192,857.64
9,891.44
Total Capital Stock and Surplus
$ 1,378,082.03
$ 1,195,115.83
TOTAL LIABILITIES, CAPITAL STOCK
$ 1,389,093.69
$ 1,207,025.86
AND SURPLUS
*273 Central Newspapers was a closely held corporation. Its securities were not registered with the Securities and Exchange Commission, and they were not regularly traded in any market. Central Shares' holdings were 7.2 percent of the 117,680 outstanding shares of Central Newspapers' preferred stock, 19.1 percent of the 139,397 outstanding shares of Central Newspapers' preferred stock, 19.1 percent of the 139,397 outstanding shares of Central Newspapers' Class A common stock and 19.5 percent of the 17,040 outstanding shares of Central Newspapers' Class B common stock. Central Newspapers published, directly or through subsidiaries, seven newspapers in Indiana and Arizona and engaged in certain related business activities. Control of Central Newspapers was vested in a voting trust of which Central Shares was not a part. The preferred stock of Central Newspapers, par value $ 25, was entitled to cumulative annual dividends of $ 1.20 per share and was callable at $ 25.50 per share. Its Class A and Class B common stock divided residual earnings and assets equally, but only the Class B common stock had voting rights. The following data is extracted from the financial documents of *274 Central Newspapers: CENTRAL NEWSPAPERS, INC., AND SUBSIDIARIES Comparative Income and Balance Sheet Data For the Years Ending 12-31-73
12-30-72
12-30-71
12-31-70
12-30-69
Operating Revenues
$ 123,657,432
$ 113,469,524
$ 100,833,517
$ 90,493,452
$ 81,722,920
Net Earnings
7,494,566
7,533,380
6,558,819
6,285,866
5,040,075
Less Preferred Dividend
141,216
141,216
141,216
141,216
141,216
Earnings After
Preferred Dividend
7,353,350
7,392,164
6,417,603
6,144,650
4,898,859
Stockholders Equity, Net
Class A and Class B
42,564,997
37,253,820
32,062,183
27,207,295
22,641,647
Per Share Data: Combined A and B, 156,437 Shares
Earnings
47.01
47.25
41.02
39.28
31.32
Dividends
13.14
11.44.h10.00
10.00
11.00
Book Value
272.09
238.14
204.95
173.92
144.73
The Indiana Telephone Corporation voting trust in which decedent held 2,907.44 units at her death held a total of 225,678 shares of Indiana Telephone Corporation common stock (hereinafter sometimes referred to as Indiana Telephone). All voting rights with respect to these shares were held by the trustee. The trust's holding was 45.86 percent of all common stock *275 outstanding and represented working control of the corporation. Decedent's voting trust units represented 3.7 percent of the beneficial interest of the voting trust. The voting trust units were transferable, although they were not publicly traded, and they received all dividends and distributions to the trust. Indiana Telephone was a public utility providing telephone service to 13 counties in southern Indiana. It was regulated by the Indiana Public Utility Commission, which sets the company's rates and allowed a rate of return of 6.95 percent on fair value. The common stock of Indiana Telephone was publicly traded in over-the-counter markets in 1974, and several investor's services listed its price as $ 35 per share. In each of five sale transactions in 1974, on January 4 and 7 and on July 5, 24 and 25, the sale price was $ 35 per share. During the 3 years preceding May 12, 1974, 3,204 shares of Indiana Telephone common stock were transferred on the company's books. On December 31, 1973, the book value of Indiana Telephone common stock was $ 28.90 per share and earnings were $ 4.55 per share. In 1977, the listed price of Indiana Telephone common stock was again $ 35 per share. *276 During that year a block of voting trust units equivalent to 5,000 shares of common stock was offered for sale at a price equivalent to $ 28 per share. An offer to purchase the units was made at a price equivalent to $ 24 per share. No sale was consummated. Public Telephone Corporation (hereinafter sometimes referred to as Public Telephone) in which decedent owned 937.5 shares of common stock, was a smaller telephone utility providing service to 2 Indiana counties. On November 12, 1973, the date of decedent's death, there were 41,500 shares of Public Telephone common stock outstanding.Decedent's shares were 2.26 percent of the total. A total of 38,375 shares, 92.5 percent of the total, were held in a voting trust of which decedent's shares were not a part. The following table shows pertinent financial data of Public Telephone for its 5 years ending December 31, 1973: 1973
1972
1971
1970
1969
Operating Revenues
$ 2,458,901
$ 2,222,057
$ 2,095,096
$ 1,887,742
$ 1,677,084
Net Income
223,132
188,004
313,940
270,536
195,861
Income Applicable
to Common
217,562
182,380
308,316
264,841
190,023
Shareholders Equity
2,940,886
2,723,266
2,549,788
2,248,995
1,997,425
Stations in Service
18,746
17,982
17,343
16,054
15,501
Per Share Data
(41,500 Shares)
Earnings
5.24
4.39
7.43
6.38
4.58
Dividends
0.25
0.25
0.25
0.25
0.60
Book Value
70.86
65.62
61.44
54.19
48.13
*277 Public Telephone's plant and equipment were comparatively modern and well-maintained. However, during the period immediately prior to May 12, 1974, the company was in need of capital to expand and repair facilities.The ratio of total debt to equity on December 31, 1973, was 1.15 to 1. On December 3, 1974, Indiana Telephone offered to purchase not less than 75 percent of the common stock of Public Telephone for $ 8 in cash and a note for $ 72 amortizable through 1989 and bearing interest at a fluctuating rate of 1 percent in excess of the weekly discount rates on Treasury bills. Public Telephone stockholders surrendered 75 percent of the company's common stock for this consideration on December 18, 1974. On the Federal estate tax return for the Estate of Ethyl L. Goodrich, the five securities here in issue were reported at the values indicated in the following table. Respondent, in his notice of deficiency, determined that the values of the securities on the appropriate date were the higher figures indicated in the table. Value Reported
Value Determined in Security
on Return
Notice of Deficiency
Indiana Telephone
Voting Trust Cer-
tificates
$ 233,606.52 $ 262,807.34
Public Telephone
Common Stock
29,634.38 50,625.00
Central Shares
Preferred Stock
38,756.25 49,170.75
Central Shares Class A
Common Stock
5,664.38 7,155.00
Central Shares Class B
Common Stock
290,457.23 993,750.00
*278 OPINION The only issues presented for decision are the fair market values of five different securities owned by the decedent, Ethyl L. Goodrich, at her death which are admitted to be includable in her gross estate. Because a timely election under section 2032 was made by the executors of the estate, the relevant date of valuation is May 12, 1974, the date 6 months after the decedent's death.
Section 20.2031-1(b), Estate Tax Regs., provides a general definition of fair market value. It states in part: (b) Valuation of property in general. The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death, except that if the executor elects the alternate valuation method under section 2032, it is the fair market value thereof at the date, and with the adjustments, prescribed in that section. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having *279 reasonable knowledge of relevant facts. The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. * * * All relevant facts and elements of value as of the applicable valuation date shall be considered in every case. * * * With respect to valuation of stock and securities, section 2031(b) provides: SEC. 2031. DEFINITION OF GROSS ESTATE. * * *
(b) Valuation of Unlisted Stock and Securities.--In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange. The regulations suggest the following factors for consideration in valuation of stocks and securities when actual *280 sale prices or bona fide bid and asked prices are not available: * * * the fair market value is to be determined by taking the following factors into consideration: * * *
(2) In the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors.
Some of the "other relevant factors" * * * are: The good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * * [Sec. 20.2031-2(f), Est. Tax Regs.] At trial, both parties presented expert witnesses who offered opinions of the values of the securities in issue. The values per share to which these experts testified are noted below, in addition to the corresponding values from the estate tax return and *281 notice of deficiency: Fair Market Value Per Share Estate Tax
Petitioner's
Respondent's
Notice of Security
Return
Witnesses
Witness
Deficiency
Indiana Telephone
Voting Trust Units
(8,343.09 Shares
Represented by
2,907.44 units)
$ 28.00
$ 28.00
$ 31.50
$ 31.50
Public Telephone
Common Stock
31.61
32.52
54.00
54.00
Central Shares
Preferred Stock
9.75
9.75
12.37
12.37
Central Shares
Class A Common
Stock
14.25
14.25
18.00
18.00
Central Shares
Class B Common
Stock
730.71
748.00
2,500.00
2,500.00
Indiana Telephone Voting Trust Certificates
The experts for both petitioner and respondent approached valuation of the Indiana Telephone voting trust certificates in the same manner. Both experts noted that Indiana Telephone common stock traded in small lots throughout a period including the date in issue at $ 35 per share. Each witness reached his proposed value by applying a discount to this figure. Respondent's witness believed that the voting trust units compared to the shares of common stock traded at $ 35 much as nonvoting common stock compares to voting common stock of many companies. He stated that a holder *282 of Indiana Telephone common stock was in no better position than a holder of voting trust units since the trustee held control of the corporation. However, this witness found that a 10 percent discount from the $ 35 figure was necessary to recognize the existence of the trust. This resulted in a value of $ 31.50. On the other hand, petitioner's principal witness used a 20 percent discount from $ 35 to arrive at his opinion of fair market value. He believed that this greater discount was necessary to account for two factors. First, decedent's voting trust units represented 8,343.09 shares of Indiana Telephone, which, although a minority of shares, was nevertheless far larger than the total of 3,204 shares of the company traded during the 3 years preceding May 12, 1974. The witness believed that the market in the stock was too thin to support a sale of such a block of shares without a depressing effect on prices. Thus, a discount for blockage was necessary. Second, the witness believed the trust units to be a less desirable investment than the shares of common stock. Although tradeable, there was apparently no market in the units, as there was for the stock. They were not registered *283 securities. Control of the stock in trust was held by the trustee, and continuation of the trust was almost certain. The application of a 20 percent discount yields a value of $ 28 per share of stock represented by the voting trust units. We note that in 1977, when shares of Indiana Telephone common stock were sold for $ 35 as in 1974, a block of voting trust units was offered for sale for $ 28 per share of stock represented. No sale occurred after a bid of $ 24 was made. In our view, petitioner's witness has more thoroughly evaluated the voting trust units. We agree, for example, that some discount for blockage is appropriate on these facts. Furthermore, the discount employed by this witness is supported somewhat by the depression in value evident in the 1977 bid and asked prices of the voting trust units. After examination of all facts of record and consideration of the testimony, we find that on May 12, 1974, the fair market value of the Indiana Telephone voting trust units owned by decedent at her death was $ 233,606.52, which reflects a value of $ 28 per share of common stock represented. Public Telephone Common Stock
Witnesses for the parties took very different *284 approaches in valuing decedent's Public Telephone common stock. Respondent's witness relied for his valuation on the price at which Indiana Telephone purchased 75 percent of Public Telephone common stock on December 18, 1974. He arrived at his opinion of value by discounting that price, which he assumed was $ 80 per share, by 10 percent because Indiana Telephone's tender offer would have included a premium to ensure acquisition of control of Public Telephone and again by 25 percent to reflect the nonmarketability of the decedent's shares. [2] Thus, it was his opinion that the fair market value of the Public Telephone common stock was $ 54 per share. Petitioner's chief witness apparently believed that the December 1974 tender offer and sale had no relationship to fair market value on May 12, 1974, and he did not consider them in his deliberations. His opinion of value was based on a capitalization of Public Telephone earnings using a multiple of 10 and a discount of 40 percent *285 from the value obtained to reflect nonmarketability of the stock and the presence of the controlling voting trust. Petitioner has argued on brief that respondent's reliance on the tender offer and sale is improper because the facts of the tender offer and sale were not facts that could be known by any buyer or seller on the valuation date in issue. See Central Trust Co. v. United States,305 F.2d 393, 403 (Ct. Cl. 1962). Petitioner's conclusion does not follow from its premise, however. It is not necessarily widespread knowledge of comparable sales that makes them relevant in valuation.Indeed, the hypothetical buyers and sellers referred to in the definition of fair market value might not be able to know of comparable sales. As with any other sales, the offer and sale in December 1974 indicates the price that was reached upon an examination of all the facts that were known at the time of offer and sale. To the extent the circumstances of the December offer and sale are comparable to those of the valuation date, the December price is indicative of the price that would have been reached on the valuation date. It is not the fact of the sale in December 1974 that *286 affects our judgment of value but the underlying facts that may be inferred from that sale. Petitioner also noted a degree of common control of the two corporations involved in the December 1974 sale and suggested that the price paid was suspiciously high and not arm's length. In our view, petitioner's suggestion is speculative and entitled to little weight in our deliberations. The record does not establish the percentage of common control of the corporations, nor is there any evidence that any common control that existed had any effect on the price that was offered and accepted. Furthermore, petitioner argues that the value of the consideration paid in December 1974 in cash and notes was less than $ 80 because of the rate of interest on the notes. The record shows that the prime interest rate of lending institutions during the week of May 9, 1974, was 11 percent. It rose to 11-1/4 percent on May 13, 1974. The interest rates on Treasury bills issued during that week were 8.44 and 8.68 percent. The rate on commercial paper of 90-to-270 day duration was 9-1/4 percent, and 2-to-5 year certificates of deposit yielded 7-1/4 percent. One witness, called by petitioner, testified *287 regarding the value of the notes paid in the December 1974 sale.Although it was his opinion that some discount from the face value of $ 72 was necessary because of the interest rate and security of the notes, he had no opinion of the magnitude of that discount. We recognize the experience of this witness and give credence to his testimony. However, the record before us supports only a small discount from face value of the notes. After careful review of the prevailing interest rates for various securities, we find that the notes in issue had a value of $ 71 on the date of sale, December 18, 1974. As previously noted, the price paid for Public Telephone common stock in December 1974 is only an indication of its value on May 12, 1974, to the extent the circumstances of the December sale are comparable to a hypothetical sale on the valuation date. Respondent's witness made two downward adjustments to the December price to reflect differences, one to reflect the premiums paid in the tender offer for control of Public Telephone and another to reflect the nonmarketability of decedent's stock. Although we agree that adjustments for these factors are appropriate, in our view the witness *288 misjudged the magnitude of the adjustments. Respondent's witness believed that only 10 percent of the December sale price represented the premium paid for control of the company. We have examined the record and the basis of this witness' opinion and have considered the opinion of one of petitioner's witnesses who testified on this issue. In our view, a much larger portion of the sale price was paid as a premium in the tender offer. Respondent's witness also applied an additional discount of 25 percent to the value reached by applying his 10 percent discount to allow for nonmarketability. Presumably, this witness believed that the buyer in the December sale, purchasing with no apparent intent to resell, gave no consideration to marketability in setting the offered price. We do not fully accept this proposition. Although the buyer may not have considered the limited marketability of the stock to be a substantial detriment, it had to realize that the limitation was generally a detriment in the market place and that this limitation would affect the price a holder of the stock would ordinarily expect to receive. In our view, the buyer would have considered the prospective seller's *289 lower expectation in setting the offered price. This does not mean that the December sale price reflected the full discount appropriate for nonmarketability of Public Telephone stock, however. Since buyer and seller did not have fully adverse interests with respect to marketability, it is reasonable to conclude that market forces did not exact the full discount that would be expected between fully adverse parties bargaining at arm's length. For this reason, some additional discount, though smaller than that used by respondent's witness, is appropriate on these facts. While the single offer and sale of Public Telephone stock 7 months after the valuation date should be considered in making a valuation, the circumstances of the sale are not sufficiently similar to those required to determine fair market value on May 12, 1974, to preempt consideration of other evidence of value. Therefore, we have given careful consideration as well to the testimony of petitioner's witness. Of particular note is the value that this witness determined to be the expected price of marketable stock using the capitalization of earnings method but before applying a discount for nonmarketability. This *290 price, $ 54.20, is 20 cents higher than the fair market value ultimately reached in the opinion of respondent's expert witness. Petitioner's witness applied a discount of 40 percent to the $ 54.20 figure to account for nonmarketability of the stock and control by the voting trust and arrived at a value of $ 32.52. However, we do not share this witness' dismal view of the marketability of the Public Telephone stock. As a regulated utility, the earnings of the company were secure, and its book value was high. Also, the inability of a holder of decedent's minority interest to influence company policy does not appear significantly more detrimental than in other cases of small minority stockholders. We have evaluated the opinions of the witnesses for both parties and considered all other aspects of the record. We are struck by the degree to which the two methods employed by the experts converge when more reasonable discounts are applied to the proper base figures. Weighing all factors before us, we have determined that the fair market value of Public Telephone common stock on May 12, 1974, was $ 45 per share.
Central Shares Preferred Stock
Witnesses for both petitioner *291 and respondent approached valuation of decedent's Central Shares preferred stock in a similar manner. They began with the annual dividend to which the stock was entitled, $ 1.10 per share, and calculated a price that, at that dividend level, would yield what they believed was a fair percentage return on investment. Petitioner's witness used 11.28 percent, and respondent's witness used 8 percent. The percentage return on investment used by petitioner's witness was selected to reflect the marketability of the shares, the financial status of the securities, and the relative size of the decedent's holdings. The witness was influenced by contemporary rates of interest in excess of 10 percent on short-term certificates of deposit and average yields of 8.5 and 8.6 percent, respectively, on publicly-traded preferred stock of certain operating and investment companies. He also noted that American Telephone and Telegraph Company issued certain bonds during the week of May 13, 1974, that yielded 8.8 percent. It was this witness' opinion that to interest an investor on May 12, 1974, the Central Shares preferred stock would have had to have yielded a return of in excess of 11 percent. He *292 valued the stock at $ 9.75 per share, which would reflect an 11.28 percent yield. Respondent's witness believed that, because the company had no outstanding debt, the preferred stock was comparable to "high grade industrial [bonds]." He noted that the yields on AAA bonds and high grade preferred stock in May 1974 were 8.37 and 7.69 percent, respectively. The witness selected a yield rate of 8 percent and then discounted the resulting figure of $ 17.75 per share by 10 percent to account for the "cost of marketing" the stock. In this witness' opinion the value of the stock on the relevant date was $ 12.37 per share. In our view, neither of the two witnesses fairly evaluated the Central Shares preferred stock. Each compared the stock to other securities not fully comparable and reached an opinion of value weighted toward the securities chosen. For instance, respondent's witness was influenced by the respective yields of "high grade" bonds and preferred stock, although Central Shares, Inc. was certainly not comparable to the companies whose securities were rated "high grade." [3] Furthermore, the absence of substantial long-term debt does not alone render preferred stock fully *293 comparable to bonds. Petitioner's witness emphasized the fact that yields of over 10 percent were available in short-term certificates of deposit. However, Central Shares preferred stock was not a short-term investment and a purchaser would receive with his stock the possibility of realizing an amount substantially in excess of his investment on liquidation or call of the stock. We are more influenced by the yields of listed preferred stock of various companies which appear in the record. Making an appropriate adjustment for nonmarketability of the Central Shares stock and other differences in these securities that appear in the record, we find that the fair market value of the Central Shares preferred stock on May 12, 1974, was $ 11 per share. Central Shares Class A Common Stock
The witnesses for both respondent and petitioner agreed that, because of the limitations and preferences of the Class A common stock, the stock had the characteristics of a preferred stock. Each witness valued the stock *294 by the same method he used to value the Central Shares preferred stock. Respondent's witness stated that a price yielding 8 percent on investment was appropriate subject to a 10 percent discount for nonmarketability. Petitioner's witness believed that a price yielding 11.23 percent adequately accounted for all factors relating to value. For reasons similar to those stated with respect to the Central Shares preferred stock, we conclude that each witness overstated his case and was influenced by securities insufficiently comparable to those in issue. We have carefully examined the record and weighed the testimony. We find that the fair market value of the Central Shares Class A common stock on May 12, 1974, was $ 16 per share. Central Shares Class B Common Stock
The final and most complicated issue before us is the value of the Central Shares Class B common stock owned by decedent at her death. The Class B common stock held rights to residual current earnings and proceeds from liquidation subject only to the limited rights of the preferred and Class A common stock. Central Shares was a closely-held holding company. Its assets were principally government securities and *295 three different issues of stock in one corporation, Central Newspapers. This fact prompted witnesses for both parties to determine the values of the Central Newspapers securities on the valuation date and to rely, at least substantially, on these values for their valuation of Central Shares. In our view, consideration of the newspaper stock is important to the valuation issue before us. Unfortunately, the parties and their witnesses disagree substantially over the value of these securities. Therefore, it has been necessary for us to examine the newspaper securities held by Central Shares in detail, along with facts relating directly to the Central Shares securities. Petitioner's witness began his analysis by noting that Central Shares' stock was not registered or actively traded. The company was subject to the personal holding company tax of section 541, and, although it was an investment company in the general sense, it did not receive the benefits of regulated investment companies under sections 851-55. Nevertheless, the witness believed that Central Shares was comparable to listed closed-end investment companies to a degree. It was his opinion that such corporations were *296 "normally valued" in relation to their net asset values, rather than to earnings or dividend levels. This witness therefore calculated a net asset value for Central Shares based in part on his opinion of the value of the newspaper stock it held. For the values of other assets, he used those shown on Central Shares' balance sheet for April 30, 1974. From the net asset value so determined, the witness took a 56 percent discount to reach his opinion of fair market value of $ 748 per share. Petitioner's witness stated that shares of closed-end investment companies typically sell at a discount from net asset value because of management expenses, latent liabilities, lack of control by individual holders, and other factors. The witness believed a discount larger than those usually found among such companies was appropriate in valuing Central Shares to reflect nonmarketability of the stock and the differences in tax treatment between those companies and Central Shares. The precise discount used appears to have been derived from an examination of three listed closed-end investment companies that were also subject to the personal holding company tax. These companies, although admitted *297 to be poor performers financially, traded at an average discount of approximately 56 percent. Respondent's witness valued Central Shares Class B common stock in a manner rather similar to that just discussed. This witness concurred that the Class B stock was best valued in relation to the company's net asset value. Like petitioner's witness, he calculated values for the newspaper stock held by Central Shares. However, for the remaining assets he used the values shown on the company's balance sheet of July 31, 1974, [4] which differs somewhat from that of April 30, 1974, used by petitioner's witness as shown in our findings.
To the net asset value so determined by respondent's witness, he applied a discount of 30 percent. The witness explained that this discount was *298 derived from the average discount from net asset value of listed closed-end investment companies on May 10, 1974, but that this average discount was doubled to reflect the nonmarketability of the Central Shares stock. Furthermore, the witness "rounded off" the figure thus calculated, $ 2,631.24, to $ 2,500 per share. In addition to the method described, both witnesses made computations relating to the value of the Class B common stock as a function of dividends paid. Respondent's witness assumed that an 8 percent yield was adequate to attract investors. Using the average annual dividend for the 5 years 1969-1974, this witness stated that this dividend level would support a price of approximately $ 1,000 per share. No adjustment was made in this calculation for nonmarketability of the stock. Petitioner's witness noted that the values assigned by him to the Class B stock would yield 10.6 percent return on investment based on the 1973 fiscal year dividend and 12.9 percent based on projected 1974 fiscal year dividends. In valuing the Central Newspapers stock held by Central Shares for purposes of applying the previously described calculations, the witnesses again used similar methods. *299 For the Central Newspapers preferred stock, each party determined the price that, considering the dividends paid, would yield a return on investment sufficient to attract investors. Petitioner's witness selected a percentage return on investment, 11.16 percent, that was said to incorporate the aspect of nonmarketability of the stock.The value suggested by this witness was $ 10.75 per share. Respondent's witness was of the opinion that the stock would attract investors with an 8 percent yield if it were freely traded. At trial, he acknowledged that a discount of 10 percent was then appropriate to reflect nonmarketability. After this discount, the value would be $ 13.50 under his approach. The analysis of the witnesses regarding this issue of stock is strikingly similar to that employed for the Central Shares preferred and Class A stock. It is apparent that the same underlying assumptions were made in valuing this issue of stock as were made before. Much of our previous discussion of the merits of the witnesses' analyses applies here as well. In addition to considering the witnesses' opinions, we have examined the underlying record carefully. In our view, an investment in Central *300 Newspapers was slightly more desirable than one in Central Shares by virtue of the more direct interest in the source of income. However, most of the negative considerations reflecting on the value of Central Shares stock are present in the Central Newspapers stock as well. On this record, we find that the value of Central Newspapers preferred stock on May 12, 1974, was $ 12.25 per share. The witnesses for both parties agreed that for the purpose of valuation the Class A common stock and Class B common stock of Central Newspapers were identical. Furthermore, both witnesses reached their opinion of value by comparing Central Newspapers to other companies that published newspapers. Respondent's witness selected 10 publishing companies of various sizes and obtained average figures for ratios of price to earnings, price to book value and price to dividends paid. He then applied these average ratios to the corresponding figure of Central Newspapers. He arrived at an overall estimate of value by averaging these resulting figures by factors of three, two and one, respectively. Finally, he discounted this figure by 25 percent to reflect nonmarketability. He valued the stock at $ 435 *301 per share. Petitioner's witness chose 6 newspaper publishing companies he deemed to be comparable. Several others were rejected because their revenues were much smaller or larger than Central Newspapers, because they had policies of growth through corporate acquisition, or because they obtained substantial portions of their revenues from activities other than newspaper publishing. After examining the general state of the newspaper industry, this witness obtained the price at which Central Newspapers' Class A and Class B stock would sell if freely traded by applying the average price/earnings ratio of the 6 companies to Central Newspapers' earnings for its calendar year 1973. The witness then applied a 45 percent discount to reflect the nonmarketability of the stock. In this witness' opinion, the value of the Class A and Class B stock of Central Newspapers was $ 199 per share on May 12, 1974. Although the methods employed by the witnesses were generally sound, an analysis of each reveals flaws that tended to distort the values determined. In the selection of comparables, petitioner's witness was too selective and excluded companies that in our view are of probative value in *302 the determination of the value of the Central Newspapers stock. On the other hand, respondent's witness failed to cull from his apparently random sample companies that differed in size and operation to a degree that would cause gross distortion in the average ratios he calculated. Likewise, in the application of the ratios derived from the comparables, petitioner's witness used only a price/earnings ratio and gave no consideration to other factors. Although it was his opinion that this was the most relevant factor, in our view, an investor would take a broader view of the company and consider other factors. Respondent's witness considered price/book value and price/dividends, as well as price earnings. However, the rigid mechanical process employed by this witness does not appeal to us as one tending to lead to a reasoned opinion of value. This is especially true where, as here, the witness offers no statistical or other basis for selection of the weighing factors. Regarding the discounts applied for nonmarketability, the 45 percent discount applied by petitioner's witness strikes us as grossly excessive in the light of this record. We have carefully examined the witnesses' *303 opinions, the exhibits produced and all other evidence in this record.On due consideration, we find that the fair market value of Central Newspapers Class A and Class B common stock on May 12, 1974, was $ 300 per share. The two principal witnesses for the parties employed different values for Central Shares' assets other than newspaper stock. Petitioner's witness used the values shown on Central Shares balance sheet of April 30, 1974, a date only 12 days before the valuation date.Respondent's witness used values from the July 31, 1974, balance sheet, a date over 2-1/2 months after the valuation date. In our view, use of the values from the April 30 balance sheet provides a more accurate basis for determination of fair market value on May 12. That date is much nearer the valuation date than July 31 and is more likely to reflect the values of May 12. The net asset value of Central Shares on May 12, 1974, based on the values of Central Newspapers stock we determined and the values taken from the April 30, 1974, balance sheet, was $ 9,506,354.03. Both principal witnesses subtracted the par value of the Central Shares preferred and Class A common stock from the net asset values they *304 determined and then applied discounts to reach their ultimate opinions of fair market value of the Class B stock.The discounts differed greatly, however. In our view petitioner's witness again applied an excessive discount considering the financial strength and stability of the company. The witness admitted that the corporations distinguished by such discounts were poor financial performers. On the other hand, the explanation respondent's witness offered for his discount reveals a lack of full analysis. We have throughly examined the testimony, exhibits and opinions of the witnesses regarding the Central Shares Class B common stock. We have paid particular attention to the methods employed by the witnesses and to the results these methods yield when the values and judgments we have expressed are employed. Based on all the facts in this record we find that on May 12, 1974, the fair market value of the Central Shares Class B common stock owned by decedent at her death was $ 1,700 per share. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. The witness explained the magnitude of the latter discount as the average discount for private placement of stock during the period 1966 to 1969 as found in a Securities and Exchange Commission study.↩
3. Examples of the companies mentioned in the record as having "high grade" securities are General Motors, Ford Motors, General Electric, Gulf Oil, Texaco, AT&T and DuPont.↩
4. The statements of this witness and his exhibits are in conflict over the date of the balance sheet used. However, the date identified by the witness was July 31, 1974, and this date was the end of the company's fiscal year. There is no evidence that a balance sheet of June 30, 1974, ever existed.On this record, we find that the balance sheet used by respondent's witness was prepared as of July 31, 1974.↩